# CIRCUIT COURT OF FAIRFAX COUNTY

Airbus Americas, Inc.

v.

Shareholder Representative
Services, L.L.C.,
as Agent for the
Company Holders
of Metron Holdings, Inc., *et al.*

June 2, 2015

Case No. CL-2014-1010

BY JUDGE JANE MARUM ROUSH

This matter came before the court for a twelve-day bench trial beginning on April 6, 2015, and concluding on April 22, 2015. At the conclusion of the trial, the court took the matter under advisement. Since then, I have had the opportunity to review and consider all of the exhibits entered into evidence, the pleadings, the testimony of witnesses, and the arguments of counsel. For the reasons stated below, the court will enter an order finding in favor of the plaintiff and awarding the plaintiff $9,414,700 in damages.

## I. *The Parties*

The plaintiff in this case is Airbus Americas, Inc. ("Airbus" or the "Plaintiff"). The defendants are Shareholder Representative Services, L.L.C. ("SRS"), as agent for the Company Holders of Metron Holdings, Inc. ("Metron Holdings"), along with the major former shareholders of Metron Holdings: Boulder Ventures II, L.P., David Ellison, Trisun Financial Group, L.L.C., Spring Capital Partners II, L.P., Ellison Family Partnership, L.P., Macks Managed Investments, The John D. Young Revocable Trust, John D. Young Revocable Trust Dated February 28, 2005, John W. Kies, Norman

T. Fujisaki, Michael P. Gundling, David Basil, Patricia Ellison, YMMM, L.L.C., Donato J. Antonucci Revocable Trust, Donato J. Antonucci Revocable Trust dated February 17, 2009, Theresa Antonucci Revocable Trust, and Theresa Antonucci Revocable Trust dated February 17, 2009 (SRS and the former shareholders may be referred to collectively as the "Defendants").

## II. *Background*

In its Amended Complaint, Airbus alleges a single cause of action against the Defendants seeking Indemnification for Metron's alleged breaches of contract related to Airbus's acquisition of Metron Holdings in 2011.

Airbus is a Delaware corporation with its principal place of business in Herndon, Virginia. (Airbus's parent, Airbus S.A.S., is based in France.) Airbus is engaged in the business of manufacturing aircraft. Defendant SRS is a Colorado limited liability company with its principal place of business in Denver, Colorado. SRS acted as an agent and attorney-in-fact for the shareholders of Metron Holdings in connection with the merger that is the subject of this lawsuit. Metron Holdings is a Delaware corporation, with its principal place of business in Dulles, Virginia. Metron Holdings is engaged in the business of developing software. Metron Holdings' subsidiary, Metron Aviation, Inc. ("Metron Aviation") specializes in developing and marketing software for use in managing air traffic flow in and out of major airports. (Metron Holdings and Metron Aviation shall be collectively referred to as "Metron.") Metron's customers are typically Air Navigation Service Providers ("ANSPs") or airlines. ANSPs are generally government agencies or government-owned companies, such as the Federal Aviation Administration in the United States.

On October 18, 2011, Airbus acquired Metron for $75 million, subject to some post-closing adjustments. The acquisition was structured as a merger, pursuant to an "Agreement and Plan of Merger" dated July 25, 2011, between Airbus, Yucatan Acquisition Corporation (a subsidiary of Airbus), Metron, and SRS (the "Merger Agreement").

In the Merger Agreement, Metron made representations and warranties to Airbus about Metron's financial condition. The shareholders agreed to indemnify Airbus for any breaches of those representations and warranties. A $5.8 million escrow (the "Escrow") was established at closing to fund any liability for a breach of a representation or warranty.

Airbus alleges that Metron breached several of its representations and warranties in the Merger Agreement. Specifically, Airbus claims that Metron breached the representations and warranties that its financial statements were kept in accordance with "Generally Accepted Accounting Principles" ("GAAP"), that Metron was not a party to any government contract that was reasonably expected to result in a loss, and that Metron had no liabilities that were not disclosed on its financial statements prepared in accordance

with GAAP. In addition, Metron's shareholders agreed to indemnify Airbus for any inaccuracies in the closing statement, known as the "Consideration Spreadsheet."

Airbus seeks $17 million in damages for Metron's alleged breaches of contract. Airbus requests an order declaring that Airbus is entitled to the entire Escrow, plus a money judgment against Metron's former shareholders for Airbus's losses in excess of the Escrow. The Merger Agreement provides that the shareholders are severally, but not jointly, liable for any damages in excess of the Escrow in accordance with the shareholder's pre-merger interest in Metron.

The Merger Agreement caps the shareholder's liability for breaches of different representations and warranties at different amounts. In most instances, their liability is capped at the amount of the Escrow. There are "Special Representations" under the Merger Agreement. Liability for a breach of a Special Representation is capped at $15 million. Indemnification for a breach of the representation and warranty that the Consideration Spreadsheet was accurate is limited to the amount of the "Merger Consideration" as that term was defined in the Merger Agreement (approximately $55 million, after adjusting for net working capital).

In their Answer, the Defendants deny that Metron breached any of its representations and warranties in the Merger Agreement, and deny further that Airbus has suffered any damages.

III. *The Representations and Warranties in the Merger Agreement Alleged To Have Been Breached*

Airbus alleges that Metron breached the following representations and warranties.

A. *Metron's Financial Statements Have Been Kept in Accordance With GAAP*

In § 3.7 of the Merger Agreement, Metron warranted that:

> The Company Financial Statements (i) are consistent with the books and records of the Companies; (ii) have been prepared in accordance with GAAP (except as disclosed in the notes thereto and except that the unaudited Company Financial Statements do not contain footnotes and are subject to normal year-end audit adjustments) applied on a consistent basis throughout the periods covered; and (iii) fairly present, in all material respects and in accordance with GAAP, the financial condition, results of operations, stockholders' equity, and cash flows of the Company as of the dates indicated thereon, subject to normal year end audit adjustments and the absence

of footnotes in the case of the unaudited Company Financial Statements.

All of the initially-capitalized terms are defined terms in the Merger Agreement. See P's Ex. # 24.

B. *Metron Has No Government Contracts Reasonably Expected To Result in a Loss*

Section 3.28(c) of the Merger Agreement provides, in pertinent part:

As of the date hereof, neither the Company [Metron] nor the Company Subsidiary [Metron Aviation] is a party to any Government Contract which is reasonably expected to result in a loss to the Company or the Company Subsidiary.

Section 1.1 of the Merger Agreement defines "Government Contract" as follows:

[A]ny prime contract, subcontract, task or delivery order, teaming agreement or arrangement, joint venture, basic ordering agreement, blanket purchase agreement, letter contract, grant, cooperative agreement, Government Bid, change order of other commitment of funding vehicle between the Company or Company Subsidiary and (a) a Governmental Authority, (b) any prime contractor to a Governmental Authority, or (c) any subcontractor with respect to any contract described in (a) or (b).

A "Governmental Authority" is defined in § 1.1 as:

[A]ny government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal, or other instrumentality of any government, whether federal, state or local, domestic or foreign.

C. *Metron Has No Undisclosed Liabilities*

Section 3.10 of the Merger Agreement provides:

The Companies [Metron Holdings and Metron Aviation] have no liabilities, indebtedness, claims, deficiencies, expenses, guarantees, or other obligations of any nature (matured or unmatured, accrued or unaccrued, fixed or contingent) required to be reflected, reserved against, or otherwise disclosed in or on the Company Financial Statements prepared in accordance with GAAP other than indebtedness, claims, deficiencies,

expenses, guarantees, or other obligations: (a) identified as such in the Company Balance Sheet; (b) described in Section 3.10 of the Company Disclosure Schedule; (c) incurred in the Ordinary Course of Business since the Company Balance Sheet Date; or (d) incurred in connection with the preparation, execution, delivery, and performance of this Agreement.

### D. *The Consideration Spreadsheet is Accurate*

Section 9.2(b) of the Merger Agreement provides, in pertinent part:

Subject to the limitations set forth in this Section 9.2(b) and Sections 9.2(a) and 9.2(c) and the other limitations set forth in this Agreement, from and after the Effective Time, Purchaser and its Affiliates and their respective stockholders, directors, officers, employees, agents, successors in interest, and assigns (each of the foregoing being referred to individually as a "Indemnified Person" and collectively as "Indemnified Persons") will be entitled to be indemnified for Damages actually incurred by such Indemnified Person as a result of ... (iv) any inaccuracy in the Consideration Spreadsheet, including any Specified Transaction Expenses that are not reflected therein... .

### IV. *The Airservices Australia Contract*

### A. *Overview of the ASA Contract*

All of Airbus's claims relate to Metron's pre-merger accounting treatment of a "Software Supply and Support Agreement" dated April 29, 2010, between Metron Aviation and Airservices Australia (the "ASA Contract"). See P's Ex. # 5. Airservices Australia ("ASA") is a corporation wholly-owned by the government of Australia. ASA is an ANSP (as such, it is the Australian equivalent of the Federal Aviation Administration).

After the merger, Airbus was disappointed in the financial performance of Metron. Airbus conducted an investigation, and concluded that the ASA Contract was generating substantial losses for Metron.

Although Airbus engaged in extensive due diligence prior to the merger in October 2011, there were no audited financial statements for Metron after December 31, 2010. The accounting errors that Airbus complains of largely occurred in 2011. Section 9.2(f) of the Merger Agreement provides that Airbus's claims to indemnification under the Merger Agreement "shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with

respect to the accuracy of or compliance with, any of the representations, warranties, covenants, or agreements set forth in this Agreement."

Upon further investigation, Airbus concluded that Metron's pre-merger financial books and records were not in accordance with GAAP in their treatment of the ASA Contract. Airbus maintains that those accounting errors resulted in a breach of Metron's representations and warranties under the Merger Agreement, thus triggering the indemnification provisions of the Merger Agreement.

Before entering into the ASA Contract, Metron was engaged in the process of developing a commercial software product for use by ANSPs. This product was called "Metron Traffic Flow." (The name was later changed to "Harmony for ANSPs.") Metron had a long-range plan for the functionality that it expected to develop for future upgrades to Metron Traffic Flow. Metron called this plan its "product roadmap." (In the context of software development, a "product roadmap" is the developer's plan of what future functionality will be added to the software and when.) Metron planned to develop Metron Traffic Flow as a commercial off-the-shelf product ("COTS") which could be sold or licensed to ANSPs around the world. According to Webopedia, which describes itself as "an online dictionary and internet search engine for information technology and computing definitions," COTS is "[s]hort for commercial off-the-shelf, an adjective that describes software or hardware products that are ready-made and available for sale to the general public. For example, Microsoft Office is a COTS product that is a packaged software solution for businesses. COTS products are designed to be implemented easily into existing systems without the need for customization," http://www. webopedia. com/ TERM/C/COTS.html, last accessed May 3, 2015. Lewis "Chip" Hathaway, the former vice president of product development for Metron both before and after the merger, testified that a COTS product is one that is ready to be delivered to the customer and that can be used immediately. Prior to the merger, Metron charged all of its research and development costs for Metron Traffic Flow as a general expense as incurred, which appeared on its balance sheet as a liability. As with many software developers, Metron expected to lose money during the development phase and recoup those losses and, it hoped, earn profits when it later sold or licensed the product to end users.

Metron's first sale of Metron Traffic Flow occurred in April 2010, when it entered into the ASA Contract. ASA was considered the "launch customer" for the product. The ASA Contract had three phases: the licensing phase, the implementation phase, and the support and maintenance phase.

Under the ASA Contract, Metron agreed to deliver software to ASA in three stages: Stage 1a, Stage 1b, and Stage 2. The functionality of Stage 1a was set forth in Schedule 2 to the ASA Contract. The functionality of Stage 1b was specified in Schedule 3 to the ASA Contract. The functionality

expected in Stage 2 was set forth in Schedule 4 to the ASA Contract, with the proviso that the final requirements of functionality under Stage 2 would be determined later by mutual agreement. When the ASA Contract was executed in April 2010, deadlines were established for the delivery of the stages: Stage 1a functionality was to be delivered by October 18, 2010, Stage 1b by May 30, 2011, and Stage 2 by December 31, 2014.

The ASA Contract was amended at various times by "Deeds of Variation." Deed of Variation No. 1 was entered into on August 11, 2010. It attached the product roadmap to the ASA Contract. Deed of Variation No. 2 was entered into on November 16, 2010. Among other things, it made minor modifications to the functionality due in Stage 1a and delayed the timing of the delivery of the functionality due in Stage 1b. Deed of Variation No. 3 was entered into on September 8, 2011. It modified the Stage 1b requirements. Deed of Variation No. 4 was entered into in April 2012 (post-merger). It replaced Schedules 3 and 4 to the ASA Contract (which detailed the functionality to be delivered in Stages 1b and 2) with new schedules that described the future functionality with greater precision.

Despite Metron's intention that Metron Traffic Flow would be a COTS product, when the ASA Contract was signed in April 2010, Stage 1a functionality was not ready to be delivered. Between April and October 2010, when a version of the Stage 1a software was delivered to Airbus, Metron had a team of software developers, seven to eight in the United States and ten in India, working to develop the functionality required by Stage 1a. The version of Metron Traffic Flow delivered to ASA in October 2010 did not contain all of the functionality required by Stage 1a. The complete Stage 1a functionality was not delivered until early 2011.

Also pursuant to the ASA Contract, Metron agreed to deliver to ASA one major and two minor releases (e.g., upgrades) to Metron Traffic Flow each year and patches (e.g., bug fixes) as needed. A major release would have significant new functionality. These releases were to be in accordance with the product roadmap, which was attached to the ASA Contract as a schedule. The product roadmap included a description of the functionality planned for each release.

Metron agreed to solicit input from ASA about ASA's experiences with the product in user collaboration sessions and to consider incorporating ASA's suggestions into future versions of the product.

In addition to the license for Metron Traffic Flow, the ASA Contract included Metron's agreement to provide implementation services (e.g., installation, training, and testing), as well as maintenance and support over the five-year term of the license.

## B. *Metron's Accounting Treatment of the ASA Contract*

### 1. *Pre-Merger*

When Metron entered into the first sale of Metron Traffic Flow to ASA in 2010, Metron did not recognize the license fee as income. Instead, Metron booked the fee as unearned income or deferred revenue, a liability, because it had not yet delivered the full functionality specified in the Stage la requirements of the ASA Contract.

After entering into the ASA Contract, Metron continued to expense as incurred the research and development costs of developing Stage 1a and the future releases of Metron Traffic Flow required by the ASA Contract.

Metron considered the version of Metron Traffic Flow licensed to ASA to be a COTS product. Therefore, at the time of contracting with ASA in April 2010, Metron did not estimate the cost of completing the development of the future functionality required by the ASA Contract. Metron believed that it was always developing Metron Traffic Flow in accordance with Metron's product roadmap, and not customizing the software specifically for ASA. Because Metron did not consider its past or future development expenses a cost of developing Metron Traffic Row to meet Metron's contractual obligations to ASA, Metron did not consider the ASA Contract to be a "loss-making contract" ("LMC") under GAAP.

In early 2011, Metron delivered to ASA a version of Metron Traffic Flow that met the Stage la functionality requirements. Therefore, after internal discussions, Metron decided to recognize the $3.6 million it had received to date from ASA as fees for the license and implementation services on Metron's books. The exact amount was $3,614,700. Key to this determination was Metron's belief that the ASA Contract did not require significant development costs or customization.

Metron made this accounting decision to recognize income in early 2011, despite the fact that ASA did not complete its "user acceptance testing" ("UAT") until September 2011. Metron considered that there was virtually no risk that ASA would not accept the software after the completion of UAT.

### 2. *Post-Merger*

After the merger in October 2011, Metron (now a subsidiary of Airbus) continued to work on developing the future functionality of Metron Traffic Flow required by the ASA Contract. Deed of Variation No. 4 was entered into in August 2012, which replaced Schedules 3 and 4 with new schedules. The new schedules eliminated the old nomenclature of Stage 1b and Stage 2 and instead replaced it with requirements that were to be delivered by December 31, 2012, and requirements that were to be delivered by December 31, 2014. Airbus maintains that there was no change in the scope

of the development required to meet the requirements of the ASA Contract after Deed of Variation No. 4. ASA was not charged any additional fees related to Deed of Variation No. 4.

In 2012, Airbus became concerned that Metron was not performing as expected after the merger. The company was losing money. Airbus analyzed the ASA Contract and, for the first time, prepared an estimate of the costs to complete ("ETC") the ASA Contract. The ETC exceeded any revenues expected under the ASA Contract. In addition, there were no new sales of Metron Traffic Flow in 2011 or 2012. (The Defendants explained that the market reacted negatively to the merger and potential customers who were in the sales pipeline at the time of the merger went elsewhere.)

Airbus determined that Metron's pre-merger accounting for the ASA Contract was not in accordance with GAAP. Therefore, in 2012, in an effort to improve Metron's balance sheet, Airbus decided to capitalize the post-merger development costs of Metron Traffic Flow. The capitalized costs created an asset on Metron's balance sheet. See D's Ex. ## 93 and 96.

Later, Airbus revisited the decision to capitalize development costs. Paul Domejean, the CFO of Airbus ProSky, the Airbus subsidiary that manages Airbus's air traffic flow management business (including Metron), testified that the decision to capitalize the development costs was abandoned because the development costs were ineligible for capitalization. Only general product development work is eligible for capitalization, not development related to a specific contract. Because all of the development work Metron was performing at the time related to the ASA contract, Mr. Domejean reversed the decision to capitalize research and development costs.

Instead of capitalizing the development costs, Airbus restated Metron's books in early 2013. The income from the ASA Contract was characterized as deferred revenue, a liability. The ASA Contract was booked as an LMC and a reserve was created on Metron's books for future liabilities associated with the ASA Contract. Development costs that had been billed to a special job code for capitalized development costs were "rejournaled" to be billed to the ASA Contract. (As the work on the ASA Contract progressed, the reserve for the LMC decreased.)

## V. *Metron's Alleged Pre-Merger Accounting Errors*

Airbus claims that Metron's accounting treatment of the ASA Contract prior to the merger as described above was not in accordance with GAAP and resulted in breaches of Metron's representations and warranties under the Merger Agreement. Specifically, Airbus alleges that Metron made the following accounting errors.

## A. *Metron's Use of "Product Accounting" Did Not Comply With GAAP*

Airbus maintains that Metron erred in using "product accounting" in accounting for the ASA Contract. According to Airbus, adherence to GAAP would have required that "contract accounting" be used instead. Contract accounting would have required Metron to wait until the end of the ASA Contract before recognizing income or until Metron could use the percentage of completion method if it had a reasonably dependable ETC for the ASA Contract.

Airbus claims that there are several reasons that Metron could not use product accounting and comply with GAAP:

(i) The ASA Contract required significant production, modification, or customization of Metron Traffic Flow; as such, the GAAP rules required that contract accounting be used;

(ii) Metron had no "vendor specific objective evidence" of key elements of the contract deliverables; therefore, Metron could not use the multi-arrangement accounting method under product accounting and was required to use contract accounting;

(iii) The ASA Contract required specified upgrades that were not separately valued; therefore, contract accounting was required; and

(iv) Metron improperly treated implementation services as a separate element of a multi-element arrangement; because the implementation services were not separately priced and were essential to the functionality of the software, contract accounting had to be used.

The effect Metron's improper use of product accounting, Airbus argues, was that, in early 2011, Metron prematurely recognized $3.6 million in income received from ASA pursuant to the ASA Contract. In Airbus's view, Metron should have continued to book the income as unearned revenue, a liability. Thus, Metron's balance sheet at the time of the merger overstated income and understated liabilities.

## B. *Metron Should Have Treated the ASA Contract as an LMC*

Airbus contends that Metron failed to follow GAAP when it did not recognize the ASA Contract as an LMC. Because (in Airbus's view) the ASA Contract required significant development and customization of the software, all of Metron's research and development costs associated with Metron Traffic Flow should have been attributed to the ASA Contract. Those research and development costs far exceeded any income expected to be received under the ASA Contract. GAAP requires that, once it became evident that the contract would result in a loss, Metron should have booked the loss immediately as a current liability and booked a reserve for future losses related to the ASA Contract.

The Defendants respond that Metron's books and financial statements were kept in accordance with GAAP and that, in particular, Metron's use of product accounting comported with GAAP.

## VI. *The Applicable GAAP Rules*

Resolution of the dispute between Airbus and Metron requires the court to interpret and apply some fairly esoteric accounting rules related to software. Timothy S. Lucas, Airbus's expert on GAAP, testified that the rules for software accounting were developed in the 1990s to address "abusive accounting in the areas of revenue recognition in the software field. The trouble areas were when companies were recognizing revenue too soon. The timing of recognition tends to be delayed under the software [product accounting] rules." Those rules are developed and promulgated by the Financial Accounting Standards Board ("FASB"). The FASB has codified all of its guidance over the years into the FASB Accounting Standards Codification (the "ASC"), which defines GAAP in the United States for non-governmental entities.

### A. *GAAP Rules for Revenue Recognition of Software Licensing Arrangements*

There are two primary methods for accounting for software contracts under the FASB rules. One is called variously "project accounting," "software accounting," "completed contract method," or "contract accounting." For simplicity, the court will refer to it as "contract accounting." The second method is called "product accounting" or "software accounting." The court will refer to this method as "product accounting." Under the FASB rules, "[t]he determination of which of the two methods is preferable is based on a careful evaluation of circumstances because the two methods should not be acceptable alternatives for the same circumstances." FASB ASC 605-32-25-1.

### 1. *Rules on Significant Production, Modification, or Customization of Software*

FASB provides "basic principles" to determine which accounting method should be used for a software contract. Under Subject 985-605-25 of the ASC, the proper accounting method to use depends on whether the software contract requires significant production, modification, or customization of the software.

Paragraph 25-2 specifies when contract accounting *must* be used:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization

of software, the entire arrangement shall be accounted for in conformity with Subtopic 605-35, using the relevant guidance in paragraphs 985-605-25-88 through 985-605-25-107 on applying contract accounting to certain arrangements involving software.

Paragraph 25-3 specifies when product accounting *may* be used:

If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:
 a. Persuasive evidence of an arrangement exists;
 b. Delivery has occurred;
 c. The vendor's fee is fixed or determinable;
 d. Collectability is probable.

FASB ASC 605-32-25-3 (internal cross-references omitted).

In general, the requirements for product accounting are stricter, because revenue can be recognized sooner under that method. If contract accounting applies, the software vendor generally must wait until the end of the contract until the vendor may recognize revenue from the contract, unless the "percentage of completion" rules apply.

### 2. Rules on When, under Contract Accounting, Income May be Recognized before Completion of the Contract

Under the "percentage of completion" rules, a vendor using the contract accounting may recognize income as work on a contract progresses, provided that the vendor has a reasonably dependable ETC for the contract. FASB ASC 605-35-25-44 advises that "[t]he estimated cost to complete (the other component of total estimated contract cost) is a significant variable in the process of determining income earned and thus a significant factor in accounting for contracts."

If the vendor has a reasonably dependable ETC, the "percentage of completion" method may be used. That method recognizes income as work on a contract progresses. FASB ASC 605-35-25-51 and 25-52. If there is no reasonably dependable ETC, the vendor must wait until the contract is completed to recognize revenue.

### 3. Rules on VSOE under Product Accounting

Under product accounting, the vendor does not have to wait until contract completion to recognize revenue. Instead, the vendor may recognize revenue from multiple elements of the contract as each element is delivered, but only if there is "vendor-specific objective evidence" ("VSOE") as to the fair value of that element. Thus, under FASB ASC 985-605-25-6:

If an arrangement includes multiple elements, the fee shall be allocated to the various elements based on vendor-specific objective evidence of fair value, regardless of any separate prices stated in the contract for each element. Vendor-specific objective evidence of fair value is limited to the following:

a. The price charged when the same element is sold separately;

b. For an element not yet being sold separately, the price established by management having the relevant authority, it must be probable that the price, once established, will not change before the separate introduction of the element into the marketplace.

If the vendor has no VSOE, contract accounting must be used unless limited exceptions apply. FASB ASC 985-605-25-9 and 985-605-25-10.

### 4. Rules on Specified Versus Unspecified Upgrade Rights under a Multiple Element Arrangement

FASB ASC 985-605-25-44 to 25-46 distinguishes between specified upgrade and unspecified upgrade rights. An unspecified upgrade right is one in which the vendor agrees to deliver future upgrades to the product "when and if" available. An unspecified upgrade right may be accounted for as part of post-contract services ("PCS") under a multiple-element arrangement. A specified upgrade right is one in which the vendor agrees to deliver future upgrades with defined functionality at specific times. A specified upgrade right may be part of a multiple-element arrangement under product accounting, if the upgrade rights are separately valued and VSOE exists for that element. If a specified upgrade right exists which is not separately valued or for which there is not VSOE, contract accounting must be used.

### 5. Rules on Services as a Separate Element under a Multi-Element Arrangement

FASB ASC 985-605-25-78 specifies when services may be accounted for as a separate element of a multi-element arrangement under product accounting:

To account separately for the service element of an arrangement that includes both software and services, sufficient vendor-specific objective evidence [VSOE] of the fair value shall exist to permit allocation of the revenue to the various elements of the arrangement (as discussed in paragraphs 985-605-25-6 through 985-605-25-7 and 985-605-25-9 through 985-605-

25-11). Additionally, both of the following conditions shall be met:

a. The services are not essential in the functionality of any other element of the transaction;

b. The services are described in the contract such that the total price of the arrangement would be expected to vary as the result of the inclusion or exclusion of the services.

If there is no VSOE for the services element or if the services are essential to the functionality of any other element (including the software itself), contract accounting must be used.

## B. *Rules for LMCs*

The ASC has rules for revenue recognition dealing with loss making contracts. (These rules are not specific to software arrangements.) FASB ASC 605-35-25-45 provides:

> For a contract on which a loss is anticipated, GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident. An entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP.

FASB ASC 605-35-25-46 provides:

When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract shall be made. Provisions for losses shall be made in the period in which they become evident under either the percentage-of-completion method or the completed-contract method.

## VII. *Application of the GAAP Rules to the ASA Contract*

### A. *Did Metron's Use of Product Accounting, Rather Than Contract Accounting, Comport with GAAP?*

Airbus contends that Metron's pre-merger accounting, and specifically its use of product accounting for the ASA Contract, failed to comply with GAAP for several reasons. Each of those reasons will be discussed in turn.

#### 1. *Did the ASA Contract Require Significant Production, Modification, or Customization?*

The crux of the dispute between the parties is whether the ASA Contract required Metron to undertake significant production, modification, or customization of the software. If it did, as Airbus maintains, Metron should have used "contract accounting" and deferred recognition of the income

from the ASA Contract until the end of the contract, or until Metron could use the percentage of completion rules. The deferred income from the ASA Contract should have appeared as a liability on Metron's balance sheet as of the day of the merger. If there was no significant production, modification, or customization of software required, as the Defendants argue, the "product accounting" method employed by Metron was proper, and Metron properly recognized the income in 2011 before the merger because Metron had VSOE for the elements delivered by that date. Thus, the Defendants contend, the income from the ASA Contract was properly recognized as income in early 2011 under GAAP and Metron's books and financial statements were kept in accordance with GAAP as of the date of the merger.

### a. *Airbus's Position*

Timothy S. Lucas testified as Airbus's expert on GAAP. Mr. Lucas was formerly a certified public accountant and was for many years a director of FASB. He chaired FASB's Emerging Issues Task Force. As such, he helped promulgate the GAAP rules.

Mr. Lucas analyzed the ASA Contract. He testified that Metron used a multiple element approach to recognizing revenue under the product accounting GAAP rules. A significant amount of revenue was assigned to the license element of the ASA Contract in early 2011. In Mr. Lucas's opinion, that revenue recognition was not in accordance with GAAP. "It clearly should have been accounted for under contract accounting."

Mr. Lucas testified that, under contract accounting method, Metron could have recognized revenue under the percentage of completion, only if it had a reasonably reliable ETC. If there was no reasonably reliable ETC, the completed contract method was the "only acceptable method." (Metron did not prepare an ETC for the ASA Contract until 2013, well after the merger.)

In Mr. Lucas's opinion, the multiple element method employed by Metron was not in accordance with GAAP because the ASA Contract required significant development, production, modification, and customization of the product. The significant development required was, in his opinion, the detailed description of the future functionality that Metron agreed to deliver to ASA in accordance with the product roadmap and other schedules attached to the ASA Contract.

Mr. Lucas explained that, under GAAP, contract accounting and product accounting are mutually exclusive. If there is significant production, modification, or customization, contract accounting must be used.

Mr. Lucas testified that Metron sold ASA a license for Metron Traffic Flow "while still in the development period." Hence, GAAP required the use of contract accounting.

Mr. Lucas faulted Metron's analysis in deciding to recognize the ASA revenue in early 2011. His chief criticism of Metron's analysis was that

Metron did not address the threshold question of whether the ASA Contract required significant production, modification, or customization.

Summarizing, Mr. Lucas concluded that, because the ASA Contract required significant development during the contract term, contract accounting should have been used and revenue should have been deferred. Under the contract accounting rules, the $3.6 million Metron received from ASA prior to the merger should have been booked as unearned income, and appeared as a current liability on Metron's balance sheet.

### b. *The Defendants' Position*

The Defendants maintain that the ASA Contract did not require significant production, modification, or customization of the Metron Traffic Flow software. Lewis "Chip" Hathaway was the vice president of product development for Metron both before the merger and (for a time) after the merger. As such, he was the "number one person familiar with the software." He testified that Metron "did not want to customize the software for any one customer. It was intended to be a COTS product. It was sold to other customers. The product roadmap was based on technological availability. In a general sense, there was no custom work for ASA."

The Defendants conceded that there was one item of custom software development for ASA: a software modification related to Qantas Airlines. The $100,000 cost of that item was billed to ASA separately, outside of the ASA Contract.

Similarly, David Basil, Metron's former senior vice president and general manager of the Commercial Products and Services division of Metron that developed Metron Traffic Flow, testified that the product "was clearly a COTS product. There was no customization required."

Metron's pre-merger accountants, McGladrey & Pullen, after reviewing the ASA Contract, opined that it did not require development costs or customization of the software. See P's Ex. # 65 and D's Ex. # 42.

McGladrey recommended that the fees received from ASA not be recognized in 2010 because delivery had not yet occurred. Additionally, McGladrey recommended that revenue recognition should be delayed until 2011 after the functionality required by Stage 1a was delivered to ASA.

Gregory Russell, the former chief executive officer of ASA from 2005 to 2012 (who has been employed as a consultant to Metron) testified that ASA considered Metron Traffic Flow to be a COTS product. He added that "we had [bad] experiences with well-meaning people who tried to build their own software." ASA knew that Metron was marketing the product to other countries. ASA had no objection to this because "it was our intention to have the software interact with other ANSPs." In Mr. Russell's view, Schedules 3 and 4 attached to the ASA Contract (Stages 1b and 2) were merely "aspirational" statements of "where the product might go" rather

than "hard and fast commitments on behalf of Metron. They were items of future discussion."

Mr. Russell agreed that the ASA Contract required Metron to provide one major release and two minor releases per year, with software patches as needed. He likened a major release to a new version of the software, such as an upgrade from version 1.0 to 2.0. He likened a minor release as upgrading from version 2.0 to 2.1. Although he considered Metron Traffic Flow to be a COTS product, none of the major releases was available off-the-shelf when the ASA Contract was signed in April 2010.

The Defendants rely on Schedule 5 of the ASA Contract to support their position that the development work done on Metron Traffic Flow was entirely at the discretion of Metron. In a section of Schedule 5 entitled "User Collaboration Sessions," Metron agreed to meet with ASA at least twice a year and discuss ASA's suggestions as to future upgrades in Metron Traffic Flow. That section provides:

> While the User Collaboration Sessions provide strategic and important input, *Metron Aviation shall be free in its own opinion to decide whether or not to include specific functionality in future releases.*

See D's Ex. # 7 (emphasis added).

Keith L. Jones testified as the Defendants' expert on GAAP. He has a Ph. D. in accounting and is the head of the accounting department at George Mason University. He disagreed with Mr. Lucas's conclusion that the ASA Contract requires significant production, modification, or customization.

Mr. Jones testified that an accountant must talk to the software engineers, the developers, and the customers. In this case, "all of the Metron people said they were developing a COTS product." In Mr. Jones's view, off-the-shelf products by definition do not require significant production, modification, or customization. Metron did not appear to be offering customized features to ASA that it was not offering to all of its potential customers. Mr. Jones noted that ASA signed the ASA Contract in April 2010 before the product roadmap had been attached as a schedule later that year. Thus, in his view, ASA was not relying on the promise of the future functionality contained in the product roadmap when it decided to license Metron Traffic Flow. Also key to Mr. Jones's determination that there was no significant production, modification, or customization was his conclusion that the specifications for the functionality of the software did not "come from the customer."

### c. The Court's Conclusions on the Issue of Significant Production, Modification, or Customization

The court agrees with Airbus that the ASA Contract did in fact require significant production, modification, or customization of Metron Traffic

Flow. When the ASA Contract was signed in April 2010, Metron's hoped-for COTS product did not exist. It took a team of seventeen to eighteen developers in the United States and India working six more months to enable Metron to deliver any software to ASA in October 2010. Even then, the software delivered did not meet the functionality required by Stage 1a of the ASA Contract. That functionality was not delivered until early 2011 and was not accepted by ASA until September 2011.

In addition to the development work needed to achieve the functionality of Stage 1a, the ASA Contract required significant development work throughout its five-year term.

The recitals to Deed of Variation No. 1 include:

> By an agreement made between Airservices Australia and Metron Aviation, Inc., dated 29 April 2010 Contract No. 2010-3422 ("Main Agreement"), Metron Aviation, Inc., agreed to *develop*, license, and maintain software more fully described in the Main Agreement.

See P's Ex. # 12 (emphasis added).

Under § 9.8 (and Schedule 5) of the Merger Agreement, Metron was required to deliver one major upgrade and two minor releases each year for so long as ASA was paying its annual support and maintenance fee. A major release required "significant functional enhancements," according to Mr. Basil, Metron's former senior vice president and general manager of the Commercial Products and Services Division. See P's Ex. # 5 and D's Ex. # 7.

In addition to the semi-annual upgrades, Metron committed itself to deliver a version of Metron Traffic Flow by May 30, 2011, that had all the Stage 1b functionality listed on Schedule 3 of the ASA Contract and a version of the product by December 31, 2014, that had all of the Stage 2 functionality listed on Schedule 4.

Under the ASA Contract, the software was required to comply with the specifications, which included all of the functionality listed in the schedules. Thus, the Defendants' claims that the specifications of future functionality to be delivered under the ASA Contract are merely "aspirational," "wish lists," "notional," or "items for further discussion," are refuted by the ASA Contract itself. The court agrees with Airbus's counsel who argued that "[w]hen wishes and aspirations are put into contracts, they become obligations."

Throughout the trial, the Defendants maintained that they were always developing Metron Traffic Flow as Metron's base product in accordance with the product roadmap for sale to others. Nevertheless, when the product roadmap was attached to the ASA Contract by Deed of Variation No. 1 in 2010, Metron obligated itself to develop Metron Traffic Flow for ASA in accordance with the roadmap. Significantly, Metron had no customers other than ASA for Metron Traffic Flow from 2010 until 2013. During those

years, all of the development work was related to Metron's obligation to continue to upgrade Metron Traffic Flow under the ASA Contract.

The court interprets the provision of Schedule 5 that "Metron Aviation shall be free in its own opinion to decide whether or not to include specific functionality in future releases" to relate to ASA's suggestions made during the user collaboration sessions. It does not negate Metron's obligations to develop the functionality specified in the preceding schedules.

Further, § 25.18 of the ASA Contract provides that any inconsistent terms are to be resolved in accordance with the "higher ranked" provision: First, the terms and conditions; second, the schedules (and as between them, in the order that they appear); and third, any document incorporated by reference. Thus, to the extent there is an inconsistency, Schedules 1 through 4 prevail over any contrary language in Schedule 5.

In sum, the court concludes that the ASA Contract required significant production, modification, or customization. Accordingly, to comply with GAAP, Metron should have used contract accounting and not product accounting. At the time of the merger, Metron's books and records were not kept in accordance with GAAP, contrary to Metron's representations and warranties in the Merger Agreement.

### 2. Did Metron Have VSOE for All the Elements Under the Multi-Element Arrangement Rules of Product Accounting?

Airbus contends that Metron could not, in compliance with GAAP, have used product accounting because it did not have VSOE for each of the elements of the multi-element arrangement.

Mr. Lucas explained that GAAP requires that a software arrangement be accounted for using either the multi-element arrangement rules under product accounting or contract accounting. If the arrangement cannot be accounted for under the multi-element arrangement rules, contract accounting must be used.

Mr. Lucas testified that a vendor cannot recognize income under a multi-element arrangement unless the vendor has VSOE for each element. The fair value of each element must be determined. According to Mr. Lucas, VSOE is generally the price at which the element is sold separately to the customer by the vendor. The value has to be vendor-specific. In other words, one would not look to what competitors are charging for the element to determine VSOE. A pricelist, standing alone, is not VSOE, although it might be indicative of VSOE. According to Mr. Lucas, "[t]he VSOE must have some real world credibility."

Mr. Lucas further explained that, if VSOE is missing for the element, there can be no revenue recognition until VSOE is developed or all the elements of the arrangement are delivered, i.e., contract completion.

There are limited exceptions to this rule: if only the elements that are *undelivered* have VSOE, the residual method may be used to determine

the VSOE for the delivered elements. See FASB ASC 985-605-25-9 and 985-605-25-10(e). If the only undelivered element for which there is no VSOE is post-contract services (which includes unspecified upgrade rights), revenue for the entire project can be recognized ratably over the post-contract support period.

Mr. Lucas criticized Metron's decision to recognize revenue in early 2010 in part because there was "not much evidence of VSOE" for the separate elements of the ASA Contract. He opined that the list price for the license itself might be evidence of VSOE for that element, although there had been no sales to other customers. Similarly, Mr. Lucas thought that Metron's calculation of 20% of the list price as the cost of maintenance and support might qualify as VSOE. He noted, however, that there was no basis for Metron's attribution of value to the implementation services. Metron never sold stand-alone implementation services to other customers.

In addition, under the multi-element arrangement rules, specified upgrade rights must be valued separately. Metron did not distinguish between specified and unspecified upgrade rights, and did not separately value those rights. Because there was no VSOE for those two elements, i.e., implementation services and rights to specified upgrades, in Mr. Lucas's opinion, contract accounting had to be used.

John W. Young, Metron's former CFO, testified that Metron had VSOE for each element of the ASA Contract. The VSOE for implementation services was determined by an estimate of the labor involved, plus costs, plus a 30% mark-up. Mr. Young testified that this method was typically used by Metron in the government contracting side of its business.

Mr. Young noted that the license element was separately priced in the ASA Contract, as were the maintenance and support services. Metron decided to recognize revenue from implementation services using the contract accounting rules for percentage of completion and to use product accounting rules for the licensing services and maintenance and support services.

Mr. Young conceded on cross-examination that either contract accounting applies or product accounting applies. GAAP does not permit a mish-mash of the two regimes in a single software arrangement Mr. Young also conceded that, if VSOE is missing for an element, contract accounting must be used and revenue deferred until VSOE can be developed or unless the percentage of completion rules apply.

The court concludes that Metron's revenue recognition in early 2011 did not comport with GAAP. Metron improperly blended contract accounting principles and product accounting principles in its accounting treatment of the ASA Contract. Additionally, for the reasons stated in the next section below, Metron had no VSOE for ASA's upgrade rights under the contract.

Because Metron did not have VSOE for each required element of the multi-element arrangement, Metron was required to use contract accounting.

### 3. Did the ASA Contract Give ASA Specified or Unspecified Upgrade Rights?

Airbus argues that Metron's accounting for the ASA Contract under product accounting was not in accordance with GAAP because Metron did not separately account for the specified upgrade rights granted to ASA under the ASA Contract as a separate element in a multi-element arrangement. Under the GAAP rules, if there is a specified upgrade right that is not separately valued as part of a multi-element arrangement, contract accounting must be used.

As mentioned above, an unspecified upgrade right is one in which the vendor agrees to deliver future upgrades to the product "when and if" available. A specified upgrade right is one in which the vendor agrees to deliver future upgrades with defined functionality at specific times.

Mr. Lucas, Airbus's GAAP expert, opined that the ASA Contract provided for specified upgrade rights, not unspecified upgrade rights "when and if" available. Deed of Variation No. 1 included the product roadmap, which described the functionality of future releases, and a timeline of when specific versions would be released.

Mr. Lucas testified that, because Metron did not separately value the specified upgrade rights and because no VSOE existed for the value of those rights, GAAP required Metron to use contract accounting, which would require that no revenue be recognized until Metron had VSOE for the element or until the contract completion. According to Mr. Lucas, "the whole allocation of revenue is flawed if you do not take into account all of the elements. You would need VSOE for [all] of those elements."

David Ellison, the former Chief Executive Officer of Metron, testified "[t]he product roadmap laid out a vision of where we were going with the product. It was a living document. It was always being revised to add new ideas." He considered the upgrades to be unspecified because they could change at any time. He testified that it was "industry standard to do one major and two minor upgrades each year, plus bug fixes as needed."

Mr. Jones, the Defendants' GAAP expert, opined that the ASA Contract appeared to require unspecified upgrades. He testified that Schedule 5 of the ASA Contract provided that Metron would release annual upgrades "when and if" available.

The court concludes that the ASA Contract granted ASA specified upgrade rights. Under the schedules to the ASA Contract, ASA had the right to receive upgrades with specified functionality and specified times. The "patches," i.e., bug fixes, were to be provided "when and if" available, but the Stage 1b and Stage 2 functionality, along with the annual major releases, and the semi-annual minor releases, were not on a "when and if" basis. Mr. Jones, the Defendants' expert accountant, appears to have misread Schedule 5. It does not say that the upgrades are to be provided "when and if" available. Thus, they constituted specified upgrade rights.

Under GAAP, specified upgrade rights have to be separately accounted for in a multi-element arrangement. If, as in this case, specified upgrade rights are not separately valued and there is no VSOE for the upgrade rights, contract accounting must be used. Because Metron did not properly account for the specified upgrade rights, its books and records were not in accordance with GAAP at the time of the merger. The result of this error was that Metron prematurely recognized revenue under product accounting when adherence to GAAP required deferred recognition of revenue under contract accounting principles.

### 4. *Were the Implementation Services under the ASA Contract Properly Treated as a Separate Element in a Multi-Element Arrangement?*

Airbus maintains that Metron improperly treated implementation services as a separate element under Metron's use of the multi-element arrangement.

Mr. Lucas testified that Metron's decision to recognize revenue in 2011 was flawed because Metron improperly treated implementation services as a separate element under a multi-element arrangement under product accounting. In Mr. Lucas's opinion, "the implementation services had to be not essential and separately priced. It failed on both fronts."

Under Schedule 1 to the ASA Contract, ASA was charged a single fee of AUS $3,189,190 for the "license and service fee." See P's Ex. # 6. Thus, there was no separate fee for implementation services. (There was a separate annual fee stated for maintenance and support.)

The FASB rules do not state that the services element of a software arrangement has to be "separately priced" to be a separate element in a multi-element arrangement. Instead, the services must be "described in the contract such that the total price of the arrangement would be expected to vary as the result of the inclusion or exclusion of the services." FASB ASC 685-605-25-78. A fair reading of the ASA Contract suggests that the combined fee for "license and service" would have been less if the implementation services were not included.

A second requirement is that the services must be non-essential to the functionality of any other element of the arrangement, including the software itself. Mr. Lucas testified that he considered the implementation services to be essential. His opinion is supported by Mr. Russell, the former CEO of ASA, who testified that, as a consultant to ASA, he has "never proposed selling the software without the implementation services. The total package was critical in terms of the success of the project."

The court concludes that the implementation services were essential to the functionality of Metron Traffic Flow. As such, adherence to GAAP would require that they not be treated as a separate element in a multi-element arrangement.

## B. *Was the ASA Contract an LMC?*

Airbus maintains that the ASA Contract should have been recognized by Metron as an LMC and booked as such. If the ASA Contract had been booked as an LMC, it would have appeared as a liability on Metron's balance sheet at the time of the merger.

Christine M. Hammer, a certified public accountant and a master of business administration, testified on behalf of Airbus as an expert on contract profitability. She opined that the ASA Contract lost Metron $12.2 million. At the time of the merger, there was already a $2.8 million loss from the ASA Contract. Ms. Hammer testified that, "at the time of the merger, an accountant who read the contract, including Schedules 2, 3, and 4, and who understood the development activities would have expected a loss."

Ms. Hammer testified that the GAAP rules for contract accounting required that all of the development costs be assigned to ASA, the launch customer. In her opinion, there was no other contract with another Metron customer close enough in time and with the same functionality required by the ASA Contract to share in the development costs. (The ASA Contract was signed in 2010, and the next contract for Metron Traffic Flow was not signed until 2013.)

Ms. Hammer explained that the fact that the ASA Contract was not identified as an LMC by Airbus's accountants during the pre-merger due diligence period was because "[t]hey were not looking at the contract level. If they were, they would have seen it."

Mr. Lucas, Airbus's expert on GAAP, testified that, at the time of the Merger, Metron's books should have shown the ASA Contract as an LMC. In his opinion, had the GAAP rules been adhered to, Metron's balance sheet on the date of the merger would have reflected a current liability of $5.8 million, which was the amount of the future loss expected from the ASA Contract at that time.

Mr. Lucas explained that the fact that there were later customers for the Metron Traffic Flow technology did not change the requirements of GAAP. Research and development expenses must be allocated to the first customer when the product is sold before it is fully developed. There are rules for combining the contracts of more than one customer. See FASB ASC 605-25-5. In general, to be combined for accounting purposes, the contracts have to be so closely related that they are part of the same project. See FASB ASC 605-25-7 through 605-25-9.

Mr. Lucas elaborated that the need to attribute the losses to the first customer would be a recurring pattern for a start-up company or a new product if the first sale is made during the development period. The problem would not occur if the software vendor sold only software already functional and agreed to provide only upgrades when and if available, i.e., unspecified upgrade rights. Mr. Lucas had no criticism of Metron's expensing research and development costs prior to the ASA Contract.

Once the ASA Contract was signed, however, GAAP required recognition of the losses, all attributable to ASA. (Mr. Lucas explained that the later customers' contracts for the same technology would be more profitable.)

Mr. Jones, the Defendants' GAAP expert, disagreed with Mr. Lucas's opinion that, if the software is still being developed when the first sale occurs, all of the development costs should be attributed to the first customer. For example, he offered, one can pre-order software before it is fully developed.

The court concludes that the GAAP rules for contract accounting would require that the research and development costs for a contract such as the ASA Contract that requires significant production, modification, or customization, be allocated to the customer. Given that the expenses of developing Metron Traffic Flow far exceeded any revenues expected under the ASA Contract, to be compliant with GAAP, Metron should have recognized that the ASA Contract was an LMC and created a loss reserve for the LMC, which would have appeared as a liability on Metron's balance sheet. Although there is no suggestion that the Defendants thought that the ASA Contract was an LMC, the concept was not foreign to them. After they acquired Metron in a management buy-out in 2009, some of the Defendants made a claim against the former owners of Metron that the former management had not properly accounted for an LMC. That earlier claim was settled. In that Metron did not treat the ASA Contract as an LMC, as of the day of the merger, Metron's books and records were not kept in accordance with GAAP.

## VIII. *Other Representations and Warranties Metron Is Alleged To Have Breached*

### A. *Was the ASA Contract a Government Contract Reasonably Expected To Result in a Loss?*

In the Merger Agreement, Metron warranted that it was not a party to any "Government Contract" with a "Governmental Authority" (defined terms in the Merger Agreement) that was reasonably expected to result in a loss. Airbus maintains that the ASA Contract meets the contractual definition of a Government Contract. Because Metron did not disclose that the ASA Contract was a Government Contract reasonably expected to result in a loss, according to Airbus, Metron breached Metron's representation and warranty that it was not a party to any such contract.

The Defendants respond that ASA is not a Governmental Authority and the ASA Contract is thus not a Government Contract as those terms are defined in the Merger Agreement. A "Governmental Authority" is defined in § 1.1 of the Merger Agreement as:

> [A]ny government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal, or other instrumentality of any government, whether federal, state, or local, domestic or foreign.

Gregory Russell, the former CEO of ASA, testified that ASA is a corporation wholly-owned by the Australian government. ASA has a board of directors, it can raise its own revenue by charging airline customers, it declares dividends, and it has its own profit and loss statement. ASA's board is appointed by the Prime Minister of the day, who has the power to remove board members. ASA's profits go to the government of Australia. ASA was created by an act of Parliament and reports to Parliament annually. Mr. Russell testified that ASA is a "government business." In the past, he referred to ASA as a "governmental organization."

Airbus contends that ASA is an "instrumentality" of the Australian government and, as such, is a Governmental Authority within the meaning of the ASA Contract. An instrumentality is "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch [especially] of a governing body." *Webster's Third New International Dictionary* 1172 (2002).

The court agrees that ASA is an instrumentality of the Australian Government, and thus ASA is a Governmental Authority and the ASA Contract is a Government Contract.

The Defendants did not consider the ASA Contract to be a Government Contract. The development work on the ASA Contract was conducted by the Commercial Products and Services division of Metron, not the Advanced Research and Engineering division that handled Metron's governmental customers, such as the Federal Aviation Administration. Metron did not list the ASA Contract as one of Metron's Government Contracts in Annex 3.28 to the Merger Agreement. Airbus, which was well-aware of the ASA Contract during the due diligence period, apparently never challenged the omission of the ASA Contract from the Government Contracts disclosures in Annex 3.28.

The specific warranty that is alleged to have been breached is contained in § 3.28(c) of the Merger Agreement. Metron warranted that it was not a party to a Government Contract that was reasonably expected to result in a loss.

Airbus argues that, if Metron's books had been kept in accordance with GAAP, Metron would have reasonably expected a loss from the ASA Contract. That argument reads a requirement into the representation and warranty that simply is not there. The court interprets that representation to mean that Metron had no Government Contract that *Metron* reasonably expected to result in a loss.

The testimony was clear that Metron expected the ASA Contract to result in a profit. Metron conducted no pre-merger analysis to determine the profitability of the ASA Contract. Metron had no ETC for the ASA Contract. Metron's business strategy prior to early 2011 was to incur losses on research and development as an investment in Metron's product. Metron expected to recoup its investment when Metron Traffic Flow was licensed to end users such as ASA. Under that plan, Metron considered the ASA Contract to be profitable because Metron did not attribute all of the research and development costs to ASA.

Under Ms. Hammer's analysis, if the direct and indirect development costs for Metron Traffic Flow were not allocated to the ASA Contract, the ASA Contract would have been profitable as of the date of the merger. See P's Ex. # 118 (a demonstrative exhibit).

The court concludes that Metron did not expect the ASA contract to result in a loss and hence did not breach the representation and warranty concerning Government Contracts in § 3.28 of the Merger Agreement.

The court's conclusion that Metron did not reasonably expect the ASA Contract to result in a loss does not change the court's analysis or conclusions on the LMC issue. The LMC rules are a GAAP concept. Metron warranted that its books and records were kept in accordance with GAAP. GAAP required that the research and development costs for Metron Traffic Flow be attributed to ASA. Had Metron observed GAAP, it would have been obvious that the ASA Contract was an LMC. Ms. Hammer testified that the ASA Contract had already lost $2.8 million as of the date of the merger. The LMC principles were familiar to the Defendants in that they had made a claim against the prior management of Metron that there was an insufficient LMC reserve when the Defendants acquired Metron in 2009.

## B. *Did Metron Have Undisclosed Liabilities?*

Metron warranted in the Merger Agreement that it had no liabilities that were not disclosed to Airbus prior to the merger. Airbus alleges that Metron in fact had undisclosed liabilities: the unearned revenue from the ASA Contract, as well as the expected loss from the ASA Contract if the ASA Contract had been recognized as an LMC, both of which should have been accounted for as liabilities on Metron's balance sheet as of the date of the merger.

For the reasons stated above, the court agrees that Metron's failure to account for the ASA Contract under applicable GAAP rules resulted in Metron having liabilities that Metron did not disclose to Airbus prior to the merger. Both the unearned revenue from the ASA Contract and the LMC provision were liabilities that should have been disclosed to Airbus.

## C. *Was the Consideration Spreadsheet Accurate?*

Under § 2.6(a)(1) of the Merger Agreement, the consideration to be paid by Airbus was decided under a formula:

> The "Merger Consideration" will consist of (1) $75,000,000 plus (2) the Adjustment Amount minus (3) the total amount of Specified Transaction Expenses plus (4) the Companies' Cash minus (5) the Companies' Debt.

The "Adjustment Amount" was defined in § 1.1 of the Merger Agreement as "the positive or negative number that is equal to (A) [Metron's] Net Working Capital calculated as of the Closing Date minus (B) the Baseline Working Capital." It was, in effect, an adjustment for net working capital. Thus, the parties agreed to adjust the consideration paid for the merger depending on the assets and liabilities reflected on Metron's balance sheet as of the date of the merger.

Pursuant to the Agreement, Metron was to prepare and submit to Airbus an estimate of the Adjustment Amount three business days before the closing on the "Consideration Spreadsheet." The amount shown as the Adjustment Amount on the Consideration Spreadsheet was subject to a post-closing adjustment once the actual data became known to Metron.

The court concludes that the Consideration Spreadsheet was inaccurate in two material respects. First, there should have been a liability for unearned income for the $3.6 million income received from ASA. Second, there should have been a liability for an LMC reserve related to the ASA Contract. The result of these omissions was that Airbus overpaid the merger consideration.

## IX. *Airbus's Damages*

Airbus has demonstrated that it is entitled to be indemnified for the damages Airbus sustained as a result of Metron's breaches of its representations and warranties in the Merger Agreement. The court has found that Metron breached its representations and warranties that its financial books and records were kept in accordance with GAAP, that it had no undisclosed liabilities, and that the Consideration Spreadsheet was accurate. Simply put, the breaches of those representations and warranties resulted in Airbus paying too much for Metron. Airbus's damages consist of the amounts by which the liabilities of Metron were understated on the Consideration Spreadsheet: the $3,614,700 liability for deferred revenue and the $5.8 million for the LMC reserve. Airbus has shown that it has suffered damages in the amount of $9,414,700.

## X. *Conclusion*

For the forgoing reasons, the court will enter an order finding in favor of Airbus and fixing Airbus's damages at $9,414,700. The order will provide that Airbus is entitled to the entire Escrow, plus a money judgment against Metron's former shareholders for Airbus's losses in excess of the Escrow.